STEPHEN R. ROSHON, JR.,

     Plaintiff,

     v.

EAGLE RESEARCH GROUP, INC.,

     Defendant.

Case No. 2:16-cv-968
Chief Judge Edmund A. Sargus, Jr.
Magistrate Judge Chelsey M. Vascura

## OPINION AND ORDER

This matter is before the Court on Defendant Eagle Research Group, Inc.'s Motion for Summary Judgment on Plaintiff's First Amended Complaint. (*Def. Mot. S.J.*, ECF No. 66.) Plaintiff filed a Response in Opposition (*Pl's. Mem. Opp.*, ECF No. 70), and in turn, Defendant filed a Reply (*Def. Reply*, ECF No. 78.) Defendant also filed a Notice of Supplemental Authority in support of its motion (*Notice*, ECF No. 81), which Plaintiff moves to strike, or in the alternative, moves for leave to file a Sur-reply, *Instanter* (*Pl's. Mot. Strike*, ECF No. 82), and to which, in turn, Defendant has filed a Response in Opposition (*Def. Opp. Mot. Strike*, ECF No. 83).

## I.     BACKGROUND

### A.    Introduction

Michael Kilpatrick, the President of Eagle Research Group, Inc. ("ERG"), provided this background on the company and its mission:

3. Eagle's principal business focus is to conduct security (and also safety) assessments for DOE's Office of Enterprise Assessments ("EA") to test the

adequacy of the measures used by DOE to protect United States' classified
matter at DOE's various research laboratories and production facilities. The
mission of the EA is to provide feedback to internal and external stakeholders
through independent evaluation of the effectiveness of safeguards and
security policies and programs throughout DOE. Basically, Eagle provides
independent oversight activities at DOE facilities that have classified operations,
including facilities that assemble and disassemble nuclear weapons and store
"Special Nuclear Material." "Special Nuclear Material" refers to materials such
as plutonium and enriched uranium that can be used for nuclear weapons. These
security assessments ensure that the DOE, or its contractor operating the facility, is
compliant with regulations and applicable national directives (for example,
DOE security directives (Orders, Manuals and Guides); Director of National
Intelligence, Intelligence Community Directives/Manuals/Guides; Director of
Central Intelligence Directives; Executive Orders 12333 and 12356).

(*Kilpatrick Decl.*, ECF No. 66-1, ¶ 3.)

This matter arises out of Plaintiff, Steve Roshon's ("Roshon") employment with

Defendant. Roshon asserts that he was employed by ERG from October 1, 2012 through May

15, 2016 as a Direct Labor Production Hourly employee who held two titles, one as a Protective

Force Specialist and later as an Information Security Specialist. There is no dispute that Roshon

regularly worked in excess of forty hours in a workweek and that ERG compensated Roshon on

a monthly basis at his hourly rate for all hours that he reported as worked, including those hours

worked over 40 in a workweek.

Roshon filed suit on October 6, 2016 seeking unpaid wages, specifically the overtime

premium for all hours he worked over 40 in a workweek, asserting that ERG misclassified him

as an employee who is exempt from the overtime provisions of the Fair Labor Standards Act

("FLSA"), 29 U.S.C. § 201 et seq. and the Ohio Minimum Fair Wage Standard Act ("the Ohio

Wage Act"), Ohio Rev. Code § 4111 et seq. On the other hand, ERG claims that it can avail

itself of the FLSA's Highly Compensated Employee ("HCE") exemption to the FLSA, and that it

does not owe Roshon payment for overtime premiums. Accordingly, ERG has filed this Motion

for Summary Judgment ("ERG's Motion"). In turn, Roshon asserts that, inasmuch as the HCE

exemption to the FLSA is an affirmative defense, it is ERG's burden to show that no genuine issue of material fact exists as to each of the three elements of the HCE exemption.

**B.  Plaintiff's Claims**

Plaintiff's Amended Complaint ("Complaint") alleges four causes of action: (1) unpaid overtime in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*; (2) unpaid overtime in violation of the Ohio Minimum Fair Wage Standards Act ("the Ohio Wage Act"), O.R.C. §§4111; [1] (3) a violation of the Ohio Prompt Payment Act, O.R.C. §4113; and (4) a violation of the recordkeeping provisions of the Ohio Wage Act, §4111.08. (*Compl.*, ECF No. 18.)  Plaintiff seeks to recover the alleged unpaid overtime compensation, and also seeks liquidated damages.

**B.  Factual Background**

Plaintiff asserts that "[i]n or around August 2013, Defendant hired Roshon as a full-time, non-exempt Information Security Specialist. At all times relevant during Plaintiff's employment, Roshon worked over forty (40) hours per workweek." (*Compl.*, ECF No. 18, ¶ 14.) Roshon "was a contractor who traveled to DOE [Department of Energy] National Laboratories around the country to assist federal employees of the OSA (Office of Security Assessments) assess security and other classified matters.  Roshon was responsible for collecting data, reading procedures and observing facilities." (*Compl.*, ECF No. 18, ¶ 16.)  Moreover, the Complaint asserts that "Roshon was not responsible for writing any of the assessment reports.  The Team Lead is responsible for approving the final report.  The Team Lead, a federal employee of the OSA is the only member of the team that has discretion and judgment with respect to findings of

---

[1] The analysis concerning the FLSA claims also applies to the Ohio state law claims to the extent there is no explicit inconsistency. "Courts have uniformly held that Ohio's wage and hour law should be interpreted in accordance with the FLSA." *Mitchell v. Abercrombie & Fitch, Co.*, 428 F.Supp.2d 725, 732 (S.D. Ohio 2006) (citing *Douglas v. Argo-Tech Corp.*, 113 F.3d 67 n.2 (6th Cir. 1997)).

the team[;] the Contractors, including Roshon, do not exercise independent discretion or judgment – they simply complete paperwork based on the data they gather, interviews they conduct and their observations." (*Compl.*, ECF No. 18, ¶ 18.)

Roshon asserts that his "primary duty was to provide support to the federal government in conducting assessments by fact gathering using well-established techniques, procedures and specific standards set out by the Defendant and the OSA. Plaintiff's primary duty was not the performance of office or non-manual work directly related to the management or general business operations of Defendant or Defendant's customers." (*Compl.*, ECF No. 18, ¶¶ 26, 27.) Rather, "Plaintiff's office time was limited to approximately one (1) to two (2) hours out of each ten (10) to twelve (12) hour day when he was conducting assessments." (*Compl.*, ECF No. 18, ¶ 28.) "Plaintiff's primary duty of conducting assessments involved the use of any methods necessary to trip up a sensor or penetrate a security procedure, including crawling, crouching, walking, running, climbing, and lifting his own body weight. He physically walked and crawled around buildings and on rooftops looking for vulnerabilities in security. The majority of Plaintiff's time was spent doing these activities." (*Compl.*, ECF No. 18, ¶ 31.) Additionally, "[a]s part of his employment with Defendant, Plaintiff was required to pass a physical exam every year. Every year, Plaintiff was required to participate in a ten (10) day physical training session involving physical exertion, weapons, and protective gear." (*Compl.*, ECF No. 18, ¶¶ 32, 33.)

Plaintiff further asserts that his primary duties were not exempted from FLSA coverage. He asserts that, in August 2016, Defendant contacted him and offered to pay him $32,000.00 in unpaid overtime that had been improperly withheld for the time period covering July 2014 to May 2016. When Roshon asked additional questions concerning the payment, Defendant's

President, Dean Hickman, called him and rescinded the offer. (*Compl.*, ECF No. 18, ¶¶ 39, 42, 43.) Upon information and belief, Roshon asserts that unpaid overtime wages were paid to "comparable employees in similar positions as Roshon." (*Compl.*, ECF No. 18, ¶ 45.)

Defendant agrees that Roshon was employed as an Information Protection Specialist ("IPS"). (*Def. Mot. S.J.*, ECF No. 66, at p. 7.) "Throughout his almost three years of employment with Eagle, Roshon primarily worked as an IPS with some ancillary administrative duties as explained herein." (*Id.* at p. 8.) Defendant further asserts that "[a]t all times during his employment with Eagle, Roshon was paid a salary in excess of $100,000.00 per year." (*Id.*) "Roshon's primary function was as [an] IPS. As an IPS, his principal duty was to conduct assessments of classified matter protection and control (CMPC), including at sensitive compartmented information facilities ("SCIFs") and special access programs ("SAPs") of the DOE." (*Id.* at p. 3.) "Roshon spent approximately thirty weeks per year as an IPS conducting some phase of an assessment." (*Id.* at p. 13.) "Because of his physical security background, he would generally be assigned to assess CMPC at most of the contamination areas which required donning protective clothing." (*Id.*) Defendant asserts that "Roshon has extensive experience in physical security of classified information. He has been working with classified matter for twenty years, beginning in the military, and it transcended his entire career." (*Id.* at pp. 13-14.) Defendant asserts:

> Roshon observed the facility or the activity and determined, based on his expertise and judgment, whether the DOE regulations were met. He excelled at evaluating the nonconforming storage of classified material. That is very important to Eagle's assessment process because some forms of classified material are not conducive to traditional storage approaches. Classified material could include a part of a nuclear weapon or tooling to create one and too large to store in a traditional vault or safe. He was adept at evaluating non-conforming storage and applying his broad technical expertise to determine if these storage requirements were acceptable in terms of DOE requirements.

(*Id.* at p. 14, interior citations omitted.) "When not conducting assessments, the other twenty-two weeks per year, it was 'other duties as assigned' which, according to Roshon, involved lots of 'reading policies and procedures, national requirements, directives, our protocols, our processes.'" (*Id.* at p. 20.)

Defendant states that the Employment Agreement provided that Roshon was paid on a monthly basis. In addition to his salary, Defendant asserts that "Roshon was also paid a bonus for working additional hours over forty per week," and those hours were paid "on a straight time basis." (*Def. Mot. S.J.*, ECF No. 66, at p. 9.) Defendant agrees that Roshon was not paid overtime at time and a half. Rather, at issue is whether Roshon was exempt from the overtime provisions of the FLSA.

## II. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). To avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *accord Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (stating that the court must draw all reasonable inferences in favor of the nonmoving party and must refrain from making credibility determinations or weighing evidence). Furthermore, the existence of a mere scintilla of evidence in support of the nonmoving party's position will not be sufficient; there must be evidence on which the jury reasonably could find for the nonmoving party. *Anderson*, 477 U.S. at 251; *see Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Matsushita*, 475 U.S. at 587–88 (finding reliance upon mere allegations, conjecture, or implausible inferences to be insufficient to survive summary judgment).

## III.    DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The Motion for Summary Judgment presently before the Court primarily concerns the applicability of the "highly compensated employee" ("HCE") exemption to Plaintiff. In a dispute over whether an employee is exempt from the FLSA's overtime requirement, the employer bears the burden of establishing that the employee qualifies for the exemption. *Martin v. Ind. Mich. Power Co.,* 381 F.3d 574, 578 (6th Cir.2004) (citing *Douglas v. Argo–Tech Corp.,* 113 F.3d 67, 70 (6th Cir.1997)). Formerly, courts held that the exemption was to be narrowly construed against the employer. *Id.*[2] The Court notes that the Supreme Court has recently rejected that principle. *See Encino Motorcars, LLC v. Navarro*, 138 S.Ct. 1134, 1142 (2018). Rather, Courts are to give the exemption a "fair reading." *Id.* The burden remains on the employer to establish each element of the exemption by a preponderance of the evidence. *Renfro v. Ind. Mich. Power Co.,* 497 F.3d 573, 576 (6th Cir. 2007).

---

[2] The Plaintiff has moved to strike Defendant's Notice of Supplemental Authority (ECF No. 82). The Court certainly may take notice of a recent Supreme Court case but ignore arguments made contemporaneously in contravention of Loc. R. 7.2(a)(3).

## A. The FLSA's Highly Compensated Employee Exemption

Defendant asserts that, at all times, Roshon was a "Highly Compensated Employee exempt from Overtime Compensation under the FLSA and Ohio Law." (ECF No. 11, at p. 17.) As dictated by the FLSA, an employer is required pay its employees at least one and one-half times their regular rate of pay for all time worked in excess of 40 hours per week. 29 U.S.C. § 207(a)(1). Certain classes of employees, however, are placed beyond the reach of the Act's overtime provisions and are deemed exempt. Specifically, the FLSA's overtime requirement does not apply to "any employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). The statute provides as follows:

> **(a) MINIMUM WAGE AND MAXIMUM HOUR REQUIREMENTS.** The provisions of sections 206 (except subsection (d) in the case of paragraph (1) of this subsection) and 207 of this title shall not apply with respect to—
>
> **(1)** any employee employed in a bona fide executive, administrative, or professional capacity …

29 U.S.C. § 213(a)(1).

The scope of this exemption has been defined by interpretative regulations issued by the Department of Labor ("DOL"). In accordance with these regulations, the administrative exemption is comprised of three elements. First, the employee must be "[c]ompensated on a salary or fee basis at a rate of not less than $455 per week." 29 C.F.R. § 541.200(a)(1). Second, the employee's "primary duty" must be comprised of "the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers." 29 C.F.R. § 541.200(a)(2). And finally, the employee's "primary duty" must "include[ ] the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a)(3).

The FLSA's regulations further provide that "[a]n employee with total annual compensation of at least $100,000 is deemed exempt...if the employee customarily and regularly performs any one or more of the exempt duties or responsibilities of an executive, administrative or professional employee..." 29 C.F.R. § 541.601(a).[3] In order to qualify for this exemption, the employee must also meet the following requirements: (i) the total annual compensation must include payment of at least $455.00 per week paid on a salary basis; and (ii) the employee must customarily and regularly perform one or more of the exempt duties or responsibilities of an executive, administrator or professional employee. The terms "customarily" and "regularly" are defined at 29 C.F.R. § 541.701:

> **§ 541.701 Customarily and regularly.**
> The phrase "customarily and regularly" means a frequency that must be greater than occasional but which, of course, may be less than constant. Tasks or work performed "customarily and regularly" includes work normally and recurrently performed every workweek; it does not include isolated or one-time tasks.

29 C.F.R. § 541.701

Defendant asserts that Roshon is an exempt employee under the FLSA, and that his "primary duties were office and/or non-manual work." (*Def. Mot. S.J.*, ECF No. 66, at p. 31.) Defendant asserts that this is because Plaintiff "performed one of the exempt duties or responsibilities of the administrative employee exemption, namely, office and non-manual work directly related to Eagle management and general business operations and those of its client, the DOE." (*Id.* at p. 30.)

FLSA overtime exemptions are "affirmative defense[s] on which the employer has the burden of proof." *Corning Glass Works v. Brennan*, 417 U.S. 188, 196–97, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974), *see also Douglas v. Argo–Tech Corp.*, 113 F.3d 67, 70 (6th Cir.1997).  To

---

[3] The regulations at 29 C.F.R. § 541.601 addressing highly compensated employees have been amended, effective May 23, 2016. *See* 81 FR 32550.

obtain summary judgment, a movant who bears the burden of proof on an issue asserted as an affirmative defense must establish all of the essential elements of the defense to warrant judgment in his favor. *Elvis Presley Enterprises, Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991); *Ely v. Dearborn Heights Sch. Dist. No. 7*, 150 F. Supp. 3d 842 (E.D. Mich. 2015), *aff'd*, 655 F. App'x 495 (6th Cir. 2016).

The Sixth Circuit has explained that, "[u]nder 29 C.F.R. § 541.601, an employee qualifies as an exempt "[h]ighly compensated employee[]" if three tests are met: "(1) a duties test; (2) a salary-level test; and (3) a salary-basis test." *Hughes v. Gulf Interstate Field Svcs., Inc.*, 878 F.3d 183, 188 (6th Cir. 2017) (citing *Orton v. Johnny's Lunch Franchise, LLC*, 668 F.3d 843, 846 (6th Cir. 2012)). Thus, it is Defendant's burden to prove that Roshon met the salary-level test, the salary-basis test, and the duties test.

### 1. Salary-level test

ERG asserts that "[a]t all times during his employment with Eagle, Roshon was paid a salary in excess of $100,000.00 per year. (¶ 11 of Exhibit 1.) His starting salary was set forth in the employment agreement: 'Eagle Research Group, Inc. will pay Employee at an annual salary of $130,520 while Employee is providing services to Eagle.' (ECF No. 49, PAGEID 386-387; ECF No. 63-1, PAGEID 3379.)" (*Def. Mot. S.J.*, ECF No. 66, at p. 8.) ERG further asserts that "[t]he Employment Agreement also provided that Roshon would be paid on a monthly basis. (ECF No. 52, PAGEID 1082; ¶ 11 of Exhibit 1.) For billing purposes to the DOE, the monthly amount was $10,896.67. (¶ 11 of Exhibit 1.)" (*Id.*, at p. 9.) ERG asserts that Roshon's compensation "always equaled or exceeded this pre-determined amount," and "[t]here was no occasion he was not paid that amount, or more, on a monthly basis, except his last partial month of employment with Eagle." (*Id.*)

Roshon testified about the nature of his employment with ERG. He asserts that he signed his Employment Agreement on October 1, 2012:

> Q.    Okay. Because it has an effective date on the first page on the top line of October 1st, 2012. So that would have been your first day of employment under the Eagle name?
>
> A.    Yes.

(*Roshon Dep.*, ECF No. 49, at 25:8-12.)

Roshon provides the following discussion of the terms of his employment agreement:

> Employee agrees to be employed by Eagle, and Eagle agrees to employ Employee as specified on the "TERMS" page attached to this Agreement; provided however, that nothing in this Agreement constitutes a guarantee of employment for any specific number of hours or days per month (or any other period).

The Term Sheet sets his compensation as:

> Eagle Research Group, Inc. ("Eagle") will pay Employee an annual salary of $130,520 while Employee is providing services to Eagle. For purposes of billing Eagle's customers, Employee's salary translates to $10876.67 monthly and to $62.75 per hour. Employee will be paid monthly in accordance with Eagles standard compensation practices established from time to time. Employee compensation will begin when Employee is provided tasking by an authorized representative of Eagle.

(*Pl's. Mem. Opp.*, ECF No. 70, pp. 13-14.) Roshon asserts that the Exempt and Non-exempt Employment Agreements share the same passage "…nothing in this agreement constitutes a guarantee of employment for any specific number of hours or days per month or any other period." Neither types of Term Sheets talk about a workweek and neither talks about how any employee will be paid for hours worked over 40 in a workweek. (*Id.*, at p. 14.) Roshon further asserts he was not paid any compensation for October 2012 through May 2013. In addition, he asserts he worked for ERG in the entire 2013 calendar year and was given a W-2 for 2013 which shows that he only earned $50,639.26. (*Pl's. Mem. Opp.*, ECF No. 70, at p. 34, citing ECF No. 64-3 (W-2).) Thus, Roshon asserts that ERG cannot meet the salary level test as to his

employment in 2013. Roshon does not dispute that he worked enough hours in 2014 and 2015 to earn more than $100,000. However, in 2016 he only earned $49,254.25 because he left his employment on May 15, 2016. (*Id.*, citing ECF No. 53-18.) Roshon asserts that this information supports his contention that "his 'salary' was wholly dependent on the number of hours he worked." (*Id.*)

On the other hand, ERG asserts that in 2013 and 2016, Roshon earned, on an annualized basis, in excess of $100,000.00. (*Def. Reply*, ECF No. 78, at p.2.) ERG asserts that for the five months Roshon was employed as a full-time employee by Eagle in 2013, he was paid $49,635.26, and that, on an annualized basis the amount would be $119,124.62. Additionally, ERG asserts that, in 2016, Roshon was paid $49,254.25 for the time he worked for ERG until he voluntarily left the company in May, 2016, to take a position with DOE. (ECF No. 53-18, PAGEID 1675.) "On an annualized basis, that is $140,920. (ECF No. 66-1, PAGEID 4086.)" (*Def. Reply*, ECF No. 78, at p. 3.) ERG asserts that:

> With respect to 2013, Mr. Roshon claims that because he signed his employment agreement on October 1, 2012, but was not paid for the first six months of 2013, he did not earn over $100,000.00, and therefore he did not meet the salary threshold. (ECF No. 70, PAGEID 4211.) However, he fails to apprize the Court that he was not formally employed on a full-time basis by Eagle until August 1, 2013.
>
> Unwin held the contract with the U.S. Department of Energy ("DOE") from July 2007 to August 2013 to provide technical and administrative support services to the U.S. Department of Energy's Office of Independent Oversight. (See ¶ 1 of Declaration of Robert W. Johnson, attached hereto as Exhibit 1.) Mr. Roshon was employed by Unwin from July 2007 through July 2013, conducting assessments under the DOE contract regarding the adequacy of the measures used by DOE to protect "Special Nuclear Material," classified matter, and other security interests at DOE's various research laboratories, production facilities and cleanup sites. (Id. at ¶ 4.) Mr. Roshon was a permanent employee of Unwin (with benefits) and paid a monthly salary. (Id.) He was therefore expected to fully support Unwin's efforts under the DOE contract, as long as he was employed by Unwin. (Id.) Mr. Roshon was fully tasked by Unwin through the contract transition period in 2013, after the award of the successor contract to Eagle. (Id. at ¶ 5.) Unwin Company is

a separate entity unrelated to Eagle. (Id.) Mr. Roshon was tasked for 190 hours in June 2013 and 176 hours in July 2013. (Id.) His timesheets reflect that he actually worked 227 hours and 290 hours for those months, respectively. (Id.) His pay stubs for June, July and August 2013 reflect that he was paid his salary; he received additional pay for extra hours worked; he received an annual performance bonus, prorated to reflect the end of the contract and his employment after July 31, 2013; an additional discretionary bonus; and payout of all of his unused vacation hours. (Id.; see also Mr. Roshon's time sheets attached thereto as Exhibit A to Exhibit 1.)

(*Def. Reply*, ECF No. 78, at pp. 3-5.)

The Court finds no genuine issue of material fact on this question. For the months that Roshon provided his services to Eagle in 2013, he was paid at a rate, when annualized, that exceeded $100,000.00.

There is no dispute that Roshon was paid more than $100,000.00 for 2014 and 2015. Therefore, for those two years, the salary-level test is met. Additionally, ERG asserts that Roshon's pro rata pay met the salary level test in 2016 under the provision of the regulation at 29 C.F.R. 541.601(b)(3):

> (3) An employee who does not work a full year for the employer, either because the employee is newly hired after the beginning of the year or ends the employment before the end of the year, may qualify for exemption under this section if the employee receives a pro rata portion of the minimum amount established in paragraph (a) of this section, based upon the number of weeks that the employee will be or has been employed. An employer may make one final payment as under paragraph (b)(2) of this section within one month after the end of employment.

29 C.F.R. 541.601(b)(3). The evidence shows that, in 2016, Roshon voluntarily left his position with ERG, and for that year, he was paid at the annualized rate of $140,920. (*Kilpatrick Decl.*, ECF No. 66-1, ¶ 11.) On the record before the Court, there is no issue of material fact that the salary-level test is met for years 2013, 2014, 2015, and 2016.

## 2. Salary-basis test

The second prong of the HCE exemption is the "salary basis" test. The Sixth Circuit recently provided guidance on this specific test in *Hughes v. Gulf Interstate Field Svcs., Inc.*, 878 F.3d 183 (6th Cir. 2017). In reversing a decision of this Court, the Sixth Circuit analyzed the DOL regulations, and concluded that an exempt employee may be paid a "day rate," but the employment arrangement must also guarantee that the minimum weekly rate will be paid on a salary basis regardless of the number of hours worked:

> Under the governing regulations, an employee meets the salary-basis test "if the employee regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed." 29 C.F.R. § 541.602(a). To Gulf Interstate and the district court, one key phrase within this test—"if the employee regularly receives"—resolves this case. *See* Appellee's Br. at 20; R. 110 (Dist. Ct. Summ. J. Op. & Order at 6) (Page ID #3740). They come to that conclusion because, as we have noted before, that regulatory phrase was once longer; it used to read: "if *under his employment agreement* he regularly receives," *Baden-Winterwood v. Life Time Fitness, Inc.*, 566 F.3d 618, 627 (6th Cir. 2009) (emphasis added) (quoting 29 C.F.R. § 541.118(a) (1973)). Thus, when a restaurant-franchise vice president named John Orton, who had an "annual base salary ... set at $125,000," sued his employer "for damages stemming from [a] period he claim[ed] he worked but was not paid," *Orton*, 668 F.3d at 845, we rejected the restaurant franchise's argument (and reversed the district court's ruling) that Orton was exempt "based on the salary that [he was] owed under [his] employment agreement" rather than what he actually received, *id.* at 848 (quoting *Orton v. Johnny's Lunch Franchise, LLC*, No. 10–11013, 2010 WL 2854303, at *5 (E.D. Mich. July 20, 2010)). Instead, in light of § 541.602(a)'s new language, "the relevant starting point for whether [Orton was] paid on a salary basis" was "not what Orton was owed under his employment agreement," but "rather ... what compensation Orton actually received." *Orton*, 668 F.3d at 848.

*Id.*, at 188-89.

The Sixth Circuit then examined the text of 29 C.F.R. § 541.602(a), and explained that the text "does not tell us what to do when an employee's salary is *not* clearly calculated 'on a weekly, or less frequent basis.'" *Id.* at 189 (emphasis original). However, the Court looked to the text of 29 C.F.R. § 541.604(b), which states:

> An exempt employee's earnings may be computed on an hourly, a daily or a shift basis, without losing the exemption or violating the salary basis requirement, if the employment arrangement also includes a guarantee of at least the minimum weekly required amount paid on a salary basis regardless of the number of hours, days or shifts worked, and a reasonable relationship exists between the guaranteed amount and the amount actually earned.

29 C.F.R. § 541.604(b). The Sixth Circuit found that the "guarantee" matters. "The section defining the salary-basis test, § 541.602(a), itself indicates the importance of a guarantee: it provides that what 'the employee regularly receives each pay period' must not be 'subject to reduction because of variations in the quality or quantity of work performed.'" *Hughes*, 878 F.3d at 190.

> On the record before us, there is a genuine issue of material fact as to whether Hughes and McDonald were guaranteed a qualifying minimum weekly salary.... Here, while Gulf Interstate has established that Hughes and McDonald were paid during the time that each was employed on the Ohio pipeline project in a way that was *consistent with* a weekly guarantee, it has not proven unreasonable the conclusion that these payments were matters of grace rather than right.

*Id.* at 191. Similarly to the plaintiffs in *Hughes*, who alleged that they were paid on a "day rate" without a weekly salary guarantee, Roshon asserts that he was paid "on an hourly basis without any guarantee and that his pay was subject to variations in the quantity of work performed." (*Pl's. Mem. Opp.*, ECF No. 70, at p. 37.)

> Q.     While employed with Eagle, were you paid on a salary basis?
>
> A.     No. I was paid hourly.

(*Roshon Dep.*, ECF No. 49, at 23:4-6.)

Roshon further testified:

> Q.     Okay. And –
>
> A.     If I worked 2,080 hours a year, I would earn that. If I worked less, I would earn less than that. And if I worked more, I would earn more than that.

Q.    Did you -- and it says -- if you look at the third line, second and third line it says the "Employee's salary translates to $10,876.67 monthly." Do you see that?

A.    Yes.

Q.    Do you know if you ever made less than that in a month?

A.    I would say yes.

(*Id.*, at 26:1-21.)

A.    We were provided a paper timecard each month and we're required to put the hours we worked that day, either record them at the end of the day or by I believe 9:00 a.m. the next morning, they had to be written on the timecard.

(*Id.*, at 34:2-6.)

ERG's witness, Mr. Paul confirmed that Roshon was not guaranteed a weekly salary:

Q.    Is he guaranteed a weekly salary?

A.    No.

Q.    Is he guaranteed at least 455 a week?

A.    130,520, if you were to divide it by 52 weeks, would exceed 455 a week.

Q.    Yeah. So, once again, the yearly salary is what's guaranteed; correct?

A.    That is the only number in his employment agreement.

Q.    That's guaranteed?

A.    That is correct.

(*Paul Dep.*, ECF No. 52, at 52:12-22.)

The Sixth Circuit noted that its interpretation of the necessity of a minimum weekly salary guarantee was consistent with Department of Labor guidance:

*See* U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter, Fair Labor Standards Act (July 9, 2003), 2003 WL 23374601, at *2 ("If a pay system compensates employees who are claimed to be exempt on the basis of hourly

wage rates computed from their actual hours worked each week, it is necessary to determine whether a salary guarantee is in effect and operational. Payment on an hourly basis without an operative salary guarantee does not qualify as a 'salary basis' of payment within the meaning of the regulations."). That guidance applies just as well here, where Hughes and McDonald have introduced evidence to suggest that their pay was not calculated hourly, but daily. If Hughes and McDonald are to qualify as exempt under § 541.601, in short, it matters whether their minimum weekly salary was in fact guaranteed, or whether it was simply something that Gulf Interstate had not so far availed itself of its right to reduce.

*Hughes*, 878 F.3d, at 191.

ERG asserts that "Roshon's salary was unquestionably pre-determined." (*Def. Reply*, ECF No. 78, at p. 7.) ERG also takes issue with Roshon's contention that "his salary was not guaranteed due to language in the employment agreement providing 'nothing in this Agreement constitutes a guaranty of employment for any specific number of hours or days per month (or any other period).' (ECF No. 70, PAGEID 4214-4215.)" (*Id.*)

On summary judgment, the evidence presented must be taken in the light most favorable to Roshon, as the nonmoving party. The burden is on ERG to prove that Plaintiff was guaranteed the threshold minimum salary that would permit him to be considered an exempt employee. At a minimum, the parties offer conflicting evidence, and there is a genuine issue of material fact as to whether Roshon was guaranteed a qualifying minimum weekly salary.

### 3. Duties test

The evaluation of an employee's primary duty is a fact-intensive inquiry that is to be based on the "character of the employee's job as a whole." 29 C.F.R. §541.700(a). In *Lutz v. Huntington Bancshares, Inc.*, 815 F.3d 988, 992 (6th Cir. 2016), the Sixth Circuit explained that an employee working in a "bona fide administrative capacity" is someone:

> (1) Compensated on a salary or fee basis at a rate of not less than $455 per week ...;
> (2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; *and*

(3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a) (emphasis added); *see also Foster v. Nationwide Mut. Ins. Co., 710 F.3d 640, 642 (6th Cir.2013).*

*Id.*

Plaintiff has alleged that his "primary duty was to provide support to the federal government in conducting assessments by fact gathering using well-established techniques, procedures and specific standards set out by the Defendant and the OSA. (*Compl.*, ECF No. 18, ¶ 26.) He alleges that his "primary duty was not the performance of office or non-manual work directly related to the management or general business operations of Defendant or Defendant's customers." (*Id.* at ¶ 27.) He further alleges that his "office time was limited to approximately one (1) to two (2) hours out of each ten (10) to twelve (12) hour day when he was conducting assessments." (*Id.* at ¶ 28.) Plaintiff further alleges that his "primary duty did not include the exercise of discretion and independent judgment with respect to matters of significance." (*Id.* at ¶ 35.) Rather, Roshon asserts that his primary duty was akin to the job of an investigator:

> Roshon's "primary duty" was in no way related to running or general business operations. Rather, it directly relates to, and therefore impacts, ERG's core business - conducting security assessments. An assessment is merely another way to say an inspection, investigation, or examination. As an employee whose primary duty was to assist with and gather data as part of ERG's assessments, Roshon was essentially an inspector, investigator, or examiner. According to Safeguards and Security Evaluations Task Leader Kevin Nowak, Roshon's primary duty is, in fact, to perform the assessments. These facts disqualify Roshon from satisfying either prong of the administrative exemption.

(*Pl's. Mem. Opp.*, ECF No. 70, at p. 42.) Furthermore, Roshon asserts that,

> [c]onsistent with the relevant regulations, the DOL has repeatedly determined that the job of an investigator is not administrative. See, e.g., FLSA 2005-21, 2005 WL 3308592 (Aug. 19, 2005) (background investigators for applicants for federal government positions that allow for top secret security clearance); 1998 WL 852783 (April 17, 1998) (journeymen investigators); 1998 WL 852752 (Jan. 23, 1998) (medical legal investigators); 1997 WL 971811 (Sept. 12, 1997) (background investigators); see also 29 C.F.R. § 541.3(b)(1) (stating that the exemptions do not

apply to investigators). And courts have consistently given great deference to the DOL's interpretation of the FLSA exemptions. The Second Circuit, for example, noted "[b]ecause the [FLSA] delegates to the Secretary [of Labor] the authority to define the 'administrative' exemption, the Secretary's definition, if reasonable, must be accepted by this Court and given the 'force and effect of law.'" *Reich v. State of New York*, 3 F.3d 581, 587 (2d Cir. 1993) (quoting *Batterton v. Francis*, 432 U.S. 416, 425 n.9 (1977)). Similarly, the Sixth Circuit has stated that "[w]here Congress grants an express delegation of authority to the agency to elucidate a specific provision of the statute to the agency by regulation [,] [the agency's] legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Beck v. City of Cleveland*, 390 F.3d 912, 919 (6th Cir.2004) (Haynes, J.) (citations omitted) (stating agency opinions be given deference, given the agency's specialized experience and broader investigations and information); *Fazekas v. Cleveland Clinic Found. Health Care Ventures, Inc.*, 204 F.3d 673, 677 (6th Cir.2000) ("[T]he written opinions of the Administrator or his deputies constitute the most reliable interpretations of the Department's regulations."). Furthermore, "the Secretary's interpretation of his own regulation is 'controlling unless plainly erroneous or inconsistent with the regulation.'" *Beck*, 390 F.3d at 919 (quoting *Auer v. Robbins*, 519 U.S. 452, 462 (1997)).

(*Id.*, at pp. 43-44.)

Plaintiff analogizes his assessor duties to those of an investigator, and reasons that,

"[i]n the 2005 DOL opinion letter cited above, the employees at issue were background investigators responsible for "providing information critical for [Defense Security Service] DSS to determine an individual's eligibility for access to classified information and/or assignment to, or retention in, positions with sensitive duties." FLSA 2005-21, 2005 WL 3308592 at *1. Investigators interviewed the subject of the investigation and witnesses who had relevant information as well as conducted public and criminal record checks. *Id.* The investigators were required to "obtain record information regarding citizenship, education, employment, unemployment, criminal convictions, medical history, financial history, foreign travel and foreign connections." *Id.* The description of the investigator's duties continues:

> The Investigator is not limited by the assignment and has discretion to investigate other leads. To accomplish this, the Investigator must assess the leads assigned for the case, following additional or alternative leads where appropriate. The Company only advises that the Investigator strike a balance between contacting a sufficient number of sources in order to get a complete picture of a subject's life and committing investigative over-kill. Striking that balance is left to the Investigator. The Contract states that investigations often involve details of the individual's life and must be conducted with tact and discretion. To that end, the Investigators must possess a high level of professional judgment in pursuing investigative leads.

*Id.* Relying on the regulations, the DOL concluded:

> We believe that the activities performed by Investigators employed by your client are more related to providing the ongoing, day-to-day investigation services, rather than performing administrative functions directly related to managing your client's business. *From the information provided in your letter, it appears that the primary duty of the Investigator is diligent and accurate fact-finding, according to DSS guidelines, the results of which are turned over to DSS who then makes a decision as to whether to grant or deny security clearances.* Such activities, while important, do not directly relate to the management or general business operations of the employer within the meaning of the regulations.

*Id.* at *4 (emphasis supplied).

(*Pl's. Mem. Opp.*, ECF No. 70, pp. 44-45.) Plaintiff asserts that "[t]he primary duty of Roshon is strikingly similar to that of the background investigators discussed above. Like the background investigators, Roshon's primary duty is diligent and accurate fact-finding, according to established guidelines and protocols, the results of which are provided to the team lead or writer to be included in a report which is subject to review by the MRB and QRB for approval. Roshon's activities, like the background investigators' activities, are important, but under the regulations, such activities do not "directly relate to the management or general business operations of the employer within the meaning of the regulations." *Id.*; *See also Gusdonovich v. Bus. Info. Co.*, 705 F. Supp. 262, 265 (W.D. Pa. 1985) (finding that an insurance investigator was not exempt)." (*Id.* at pp. 45-46.)

ERG agrees that "[t]he duties of the administrative exemption are two-fold. First, the work must be directly related to the management or general business operations of the employer or the employer's customers. Second, the primary duty must include the exercise of discretion and independent judgment with respect to matters of significance. 29 C.F.R. § 541.200(a). However, ERG asserts that, "for purposes of the highly compensated exemption, the employee need only perform one of these duties." (*Def. Mot. S.J.*, ECF No. 66, at pp. 38-39.) ERG relies on the Fifth Circuit's decision in *Zannikos v. Oil Inspections (U.S.A.), Inc.*, 605 Fed.App'x. 349, 359 (5th Cir. 2015) ("In discussing the administrative exemption above, we concluded that

Zannikos primarily performed non-manual work directly related to the management or general business operations of Oil Inspections' customers."). ERG also asserts that the HCE exemption is a less burdensome standard than the standard to be applied for the administrative exemption. ERG relies on *Haas v. Verizon New York, Inc.*, No. 13-cv-8130, 2015 WL 5785023 (S.D. N.Y. Sept. 30, 2015) to support this distinction.

In *Haas*, the Court essentially held that in a case of a highly compensated employee, the administrative exemption is less burdensome. The Defendant notes that *Haas* held that "the language of the administrative regulation requires that an employee's "primary duty *is* the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers" whereas under the highly compensated employee exemption, the primary duty only *includes* office or non-manual work. *Id.* at *3. Therefore Verizon only had to show that the employee's primary duty consisted, "at least in part, of non-manual work" and not that it "consist entirely of such work." *Id.* "

Accordingly, the court in *Haas* further held that:

> Even assuming, however, that the inspections are in fact 'intertwined' with physical activity because Plaintiffs are performing physical tasks 'as they are actually doing the observation and inspection' *** such inspections, in the Court's view, nevertheless do not constitute manual work for the purposes of §541.601(d). The only skill Plaintiffs have identified is 'the skill of engaging in physical activity to perform your job.'" *** The jobs expressly listed in §541.601(d), however, all require more. The physical work Plaintiffs perform does not demand the skills necessary in jobs like carpentry, electrical work, plumbing or engineering. Nor are the physical tasks Plaintiffs perform similar to those performed by laborers, for whom the entirety of their work involves, repetitive physical tasks more demanding that those performed by Plaintiffs. Accordingly, while Plaintiffs may exhibit strength and dexterity when '[lying] on the ground, climb[ing] over obstacles[, ... and] mov[ing] items on the site[s],' *** they do not engage in tasks involving 'physical skill' when conducting their inspections. *** In any event, whether some measure of physical

skill is required to conduct some of the inspections or not, no reasonable juror could conclude that Plaintiffs' inspections do not '*include* [] performing office or non-manual work.'

(*Def. Mot. S.J.*, ECF No. 66, at pp. 35-36.)

The Sixth Circuit has not recognized the distinction made in *Haas*. Instead, in *Lutz*, the Sixth Circuit examined the work of residential loan underwriters who worked for Huntington Bank, and held that first, to fall within the administrative exemption, "an underwriter's work must 'directly relate[] to the management or general business operations of [Huntington] or [the Bank's] customers,' 29 C.F.R. § 541.200(a)(2), and that work must be an underwriter's 'primary duty.' 29 C.F.R. § 541.201(c). *Lutz*, 815 F.3d at 992. Further, "[t]o determine whether an underwriter's work directly relates to management or general business operations, we apply an "administrative-production dichotomy." *Id.*, citing *Foster*, 710 F.3d at 644.

> The DOL regulations define administrative employees as those who "perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.201(a). The work of an administrative employee is thus considered "ancillary to an employer's principal production activity." *Renfro v. Ind. Mich. Power Co.*, 370 F.3d 512, 517 (6th Cir.2004) ("*Renfro I* ") (citation omitted). Huntington's underwriters perform administrative work because they assist in the running and servicing of the Bank's business by making decisions about when Huntington should take on certain kinds of credit risk, something that is ancillary to the Bank's principal production activity of selling loans.

*Lutz*, 815 F.3d at 993. The *Lutz* Court stated that, "[i]n this circuit, the focus is on whether an employee helps run or service a business – not whether that employee's duties merely touch on a production activity. *Id.*, at 995. This holding, binding on the court, is in contrast to *Haas*.

At bottom, Plaintiff and Defendant have presented conflicting evidence about the nature and extent of Roshon's non-manual duties, and genuine issues of material fact exist concerning

the work Roshon performed. Further, since the state law claims are dependent on the federal causes of action, summary judgment is **DENIED** for both federal and state claims.[4]

## IV.    CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment on Plaintiff's First Amended Complaint (*Def. Mot. S.J.*, ECF No. 66) is **GRANTED** on the issue of salary-level for 2013, 2014, 2016, and 2016, and is otherwise **DENIED**. Plaintiff's Motion to Strike, or in the alternative, for leave to file a Sur-reply, *Instanter* (*Pl's. Mot. Strike*, ECF No. 82) is **DENIED as MOOT**.

**IT IS SO ORDERED.**

5-29-2018
**DATE**

EDMUND A. SARGUS, JR.
**CHIEF UNITED STATES DISTRICT JUDGE**

---

[4] The final prong of the duties test is whether Plaintiff is someone "(3) whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a); *see also Foster v. Nationwide Mut. Ins. Co.*, 710 F.3d 640, 642 (6th Cir.2013). ERG does not address this prong of the test. Rather, ERG asserts that it "is not relevant here as Eagle need only show he met one of the administrative duties, which it has." (*Def. Mot. S.J.*, ECF No. 66, at p. 38.)   Because ERG has the burden of proof for all elements of its affirmative defense, summary judgment is precluded for the "discretion" prong.